# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-IA-01238-SCT

*IN THE MATTER OF THE GUARDIANSHIP*
*OF BLAINE MICHAEL ROSHTO, A MINOR:*

*NATALIE DEASON*

*v.*

*JOSEPH M. STINSON, GUARDIAN AD LITEM*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/20/2012 |
| TRIAL JUDGE: | HON. DEBBRA K. HALFORD |
| COURT FROM WHICH APPEALED: | AMITE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JAMES W. SHELSON |
| | ROBERT GREGG MAYER |
| | FRED L. BANKS, JR. |
| | GARY L. HONEA |
| ATTORNEY FOR APPELLEE: | JOSEPH M. STINSON (PRO SE) |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 03/27/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.     In the instant guardianship case, the ward's guardian petitioned for transfer of the guardianship to Louisiana, where the ward and guardian had moved. Also before the court was a proposed investment plan for the ward's proceeds from a settlement. The chancellor denied both the request to transfer the guardianship and the guardian's proposed investment plan, and the guardian appealed. Finding no error, we affirm.

**Facts and Procedural History**

¶2.    Blaine Roshto was born to Shane and Natalie Roshto on February 13, 2007. On April 20, 2010, Shane died in the Deepwater Horizon oil rig explosion. Natalie and Blaine were Shane's sole heirs and wrongful death beneficiaries. The Amite County Chancery Court appointed Natalie as Blaine's guardian, because Blaine had a potential claim for damages for the wrongful death of his father. In April 2011, the court authorized a substantial settlement on Blaine's behalf. In light of a dispute regarding attorneys' fees in the wrongful death suit and a request from Natalie to invest Blaine's funds in non-insured deposit accounts, the chancellor determined that a guardian ad litem was needed to protect Blaine's interest. The court appointed Joseph Stinson as Blaine's guardian ad litem.

¶3.    Natalie married Slade Deason in July 2011, and she and Blaine moved to Slade's hometown in Louisiana.[1] On December 29, 2011, Natalie filed a "Petition to Approve Final Accounting and for Authority to Transfer Guardianship," requesting that the court transfer the guardianship to Louisiana. Natalie had hired financial planning professionals and tax attorneys to assist her with financial decisions related to Blaine's portion of the settlement. Attached to her petition to transfer was an investment proposal for Blaine's settlement funds, which suggested placing approximately half of Blaine's assets in a tax-free structured settlement and putting the other half into a managed "grantor asset protection trust." The petition to transfer stated that, since Blaine was a resident of Louisiana, the Louisiana court had jurisdiction and was "the appropriate court to approve the investment" of Blaine's funds.

---

[1] Natalie met Slade in September 2010, through another widow who lost her husband in the Deepwater Horizon explosion. Slade had been good friends with that widow's husband as well as the widow's brother, who was killed in a car accident in September 2010.

¶4.     The chancery court held two hearings on Natalie's motion to transfer and the investment proposal, during which the chancellor heard testimony from Natalie, the guardian ad litem, financial advisors, and one of Natalie's attorneys. The chancellor heard extensive testimony from and asked questions of the financial experts regarding the proposed investments as well as the Certificate of Deposit Account Registry Service (CDARS).[2] Because the CD interest rate at the time was low and the income earned would be taxed, the financial advisors opined that placing the entire settlement in CDARS effectively would give Blaine a negative rate of return, especially when inflation is considered. In addition to the live testimony, the parties submitted information and affidavits pertaining to the potential investment strategies. The guardian at litem also filed an extensive written report, to which Natalie responded. The guardian ad litem opposed both the transfer to Louisiana and Natalie's proposed investment strategy.

¶5.     Throughout both proceedings, the chancellor repeatedly expressed that her focus was on Blaine's best interest. After considering the pleadings and reports, holding two hearings, listening to extensive testimony from both sides, and engaging in the discussion and questioning the witnesses, the chancellor – noting that the she had "taken more testimony regarding the investment of this minor's fund than any other case during my tenure in office" – denied Natalie's request to transfer the guardianship to Louisiana and her investment

_____

[2] Through CDARS, someone with large sums of money can deposit and manage CDs through only one bank. That bank distributes the money among other banks for placement in CDs, ensuring that less than $250,000 goes to each bank. The depositor works only with the "base" bank, but his entire sum of money is FDIC insured because it is properly distributed among various financial institutions.

proposal. The chancellor ordered Natalie to deposit the funds in an FDIC insured bank account in Mississippi and to use CDARS. Natalie filed a petition for interlocutory appeal.

**Discussion**

¶6. Natalie raises two issues on appeal. First, she claims that the chancery court abused its discretion by denying the transfer of the guardianship to Louisiana. She maintains that if the Court finds abuse of discretion and authorizes the transfer, then the second issue is moot. However, if the Court finds that the guardianship should remain in Mississippi, Natalie asserts that the chancery court abused its discretion in directing that the entire settlement amount be invested in CDARS.

¶7. "A minor under guardianship is a ward of the [c]hancery [c]ourt." *Carpenter v. Berry*, 58 So. 3d 1158, 1162 (¶ 19) (Miss. 2011) (quoting *Matter of Conservatorship of Mathews*, 633 So. 2d 1038, 1039 (Miss. 1994)). Decisions related to a guardianship lie largely within the sound discretion of the chancellor, as the ultimate guardian of wards of the court, and those decisions are reviewed for abuse of discretion. *See Jackson v. Jackson*, 732 So. 2d 916, 920-21 (¶ 5) (Miss. 1999); *Conservatorship of Harris v. King*, 480 So. 2d 1131, 1132 (Miss. 1985); *Neville v. Kelso*, 211 So. 2d 825, 826 (Miss. 1968); *Conner v. Polk*, 161 Miss. 24, 133 So. 604, 605 (1931). "This Court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous[,] or an erroneous legal standard was applied." *Sanderson v. Sanderson*, 824 So. 2d 623, 625-26 (¶ 8) (Miss. 2002) (quoting *Kilpatrick v. Kilpatrick*, 732 So. 2d 876, 880 (¶ 13) (Miss. 1999)).

4

**I. Whether the chancery court abused its discretion by denying the petition to transfer the guardianship to Louisiana.**

¶8. Natalie argues that the chancery court abused its discretion by denying the transfer of the guardianship to Louisiana based solely on "unwarranted speculation" that Natalie's marriage to Slade would fail. She also asserts that the chancery court abused its discretion by failing to apply a "reasonable legal standard" to the determination of whether to transfer the guardianship. We hold that the chancellor's decision to deny the transfer was based on substantial evidence and, further, the chancellor correctly applied the standard and procedure of Mississippi Code Section 93-13-63 pertaining to transfer of guardianships.

¶9. Mississippi Code Section 93-13-63 provides that "[i]f a guardian desire to remove the person and personal property of his ward out of this state, on petition and on his making settlement of his guardianship accounts, the court which appointed him *may* make an order to that effect[.]" Miss. Code Ann. § 93-13-63 (Rev. 2013) (emphasis added). According to Section 93-13-63, for the court to allow a guardianship to be moved out of Mississippi, the guardian must: (1) file a petition requesting removal of the guardianship; (2) settle the guardianship accounts; and (3) give a bond with two sureties residing in Mississippi for the full value of the estate to ensure that the guardian will qualify as guardian and file required paperwork in the new jurisdiction. *Id.* Section 93-13-63 is permissive, not mandatory, and the statute gives the chancellor wide discretion once the three prerequisites are met.[3] *Id.*

---

[3] Natalie suggests that the Court adopt the Uniform Adult Guardianship Act. However, the Mississippi Constitution empowers the Mississippi Legislature, not the Court, to enact legislation. *See* Miss. Const. art 1, § 2. *See also* **Jenkins v. Borodofsky**, 211 So. 2d 874, 876 (Miss. 1968) ("The enactment, modification[,] or repeal of laws, wise or foolish, is a problem for the legislature of this state. This Court has no authority in this regard."). The

¶10.    Natalie asserts that the chancellor's denial of her request to move the guardianship rested solely on concerns about Natalie's new marriage; however, a review of the record and the hearing transcripts indicates otherwise. The chancellor heard testimony from Natalie, the guardian ad litem, and financial advisors regarding the proposed investments and the transfer to Louisiana. The chancellor also had an extensive report from the guardian ad litem and a response to that report from Natalie.

¶11.    Natalie testified and presented evidence that she already had been appointed as Blaine's tutrix (the Louisiana equivalent of a guardian) by a district court in Louisiana and that she had presented a complete inventory of Blaine's estate to that court. Natalie testified that she and Slade were building a house in Louisiana, Blaine was enrolled in school there, Blaine's primary doctors were in Louisiana, she received her bills and financial information in Louisiana, she had a Louisiana driver's license, she was registered to vote there, and her primary doctors and lawyers were in Louisiana. She testified that she intended to raise Blaine in Louisiana and live there for the rest of her life.

¶12.    The guardian ad litem recommended that the transfer be denied. He was concerned that the age of majority in Louisiana is eighteen, while it is twenty-one in Mississippi; thus, in Louisiana, Blaine would receive his money at a younger age, and he may not have the maturity to handle such a substantial sum of money. He was concerned that, at the time of

dissent suggests that the Court "set forth factors that a chancellor may consider in making a determination of whether to transfer a guardianship to another state." (Diss. Op. ¶ 33). We decline to do so because we are not without a standard to follow. At this time, the standard is Mississippi Code Section 93-13-63, which provides the prerequisites that must be met before a transfer will be considered. That section gives the chancellor discretion in determining whether to allow the transfer once the prerequisites have been met.

the hearing, Natalie and Blaine had been living in Louisiana only seven months, since Natalie married Slade, and the only reason they moved there was because it was Slade's state of residence. He testified that Natalie and Blaine had strong connections to Amite County. Both Natalie and Blaine had lived in Amite County for their entire lives until the move to Louisiana seven months before. Further, her parents and grandparents lived in Amite County. The guardian ad litem opined that if anything were to go wrong in the marriage, Natalie and Blaine likely would return to Mississippi, where their family lives. He suggested that the guardianship could be transferred at a later date if it was in Blaine's best interest. However, due to the recency of their move to Louisiana, he recommended that the guardianship remain in Mississippi.

¶13. As discussed above, Natalie attached the letter from her investment advisors to the petition to transfer Blaine's guardianship. The chancellor had asked Natalie to provide the investment information at an earlier hearing after Natalie raised the issue of investing Blaine's settlement funds in non-insured deposit accounts. Natalie had provided the requested information, and the chancellor had appointed a guardian ad litem to consider the investment proposal. However, the petition to transfer asserted that a Louisiana court should be the court to approve the investment plan after the guardianship was transferred. Once the chancellor indicated that she would not transfer the guardianship, the focus of the hearing turned to the investment plan. According to the chancellor's order, through Natalie's testimony, the chancellor became concerned about Natalie's ability to handle the investments, noting that Natalie was a young adult, she had not finished college, and she had no experience with investments. The chancellor wrote that Natalie's "testimony to the Court

7

demonstrated that she lacks the financial sophistication to understand the nature and consequences of the financial decisions she would be called upon to make, if her investment proposal were approved."

¶14. At the end of the first hearing, the chancellor said that she intended to deny the transfer. She correctly explained that, under the statute, whether to allow the transfer was entirely within her discretion. The chancellor shared the guardian ad litem's concern about Natalie's new marriage, noting that Natalie and Slade had been brought together through severe tragedy, and that they had known each only a short time, on the heels of that tragedy, before getting married. The chancellor held that in the interest of Blaine's stability, the guardianship should remain in Mississippi.

¶15. After the second hearing pertaining to the investment proposal, the chancellor entered an order denying Natalie's request to transfer the guardianship and directing that Blaine's settlement proceeds be invested in CDARS. The chancellor only briefly mentioned the denial of the transfer in the order; however, a review of the order, the record, and the hearing transcripts indicates that the chancellor considered many factors, including concerns about the longevity of Natalie's marriage, the short length of time Natalie and Blaine had been in Louisiana compared to how long they had lived in Mississippi before the move, Natalie and Blaine's roots and family connection to Mississippi, Natalie's age and background, Natalie's lack of financial sophistication and understanding of investments, the age of majority in Louisiana, and the best interest of the child. There is nothing arbitrary about the chancellor's order, she did not err as to any factual determinations, and she did not follow an incorrect legal standard.

8

¶16. At the core of this issue is the fundamental tenet that "[a] minor under guardianship is a ward of the [c]hancery [c]ourt." *Carpenter*, 58 So. 3d at 1162 (¶19) (quoting *Mathews*, 633 So. 2d at 1039). We have written the following about a chancellor's duty to a minor under guardianship:

> It is the inescapable duty of the said court and or the chancellor to act with constant care and solicitude towards the preservation and protection of the rights of infants and persons non compos mentis. The court will take nothing as confessed against them; will make for them every valuable election; will rescue them from faithless guardians, designing strangers, and even from unnatural parents, and in general will and must take all necessary steps to conserve and protect the best interest of these wards of the court.

*Id.* In refusing to transfer the guardianship, the chancellor reached a carefully considered determination of the issue before her and fulfilled her duty to "act with constant care and solicitude towards the preservation and protection" of Blaine's estate. We cannot find abuse of discretion or error of law on her part.

## II. Whether the chancery court abused its discretion by requiring the settlement funds to be put into CDs.

¶17. The chancellor determined that, because Natalie's proposed investment plan would not limit the funds to being placed in FDIC insured accounts from which funds could not be withdrawn without a court order, Mississippi Code Section 93-13-17 required the guardian post a bond in the full amount of the guardianship funds. The chancellor noted, and the parties had conceded, that "such a bond would be extremely difficult to find and that the annual premium would be exorbitant." Regarding the use of a structured settlement, the chancellor expressed concern that "the minimal savings on income taxes would be offset by the cost of the bond and by the loss of potential increased earnings when the interest rates

9

rise." As to the proposal to put half of the money into a trust account, the chancellor held that "[a]llowing the funds to be placed outside the control of the [c]ourt, without bond, would be an abuse of the authority of the [c]ourt and neglectful of the duty to the minor." The chancellor ordered Natalie to deposit the funds in an FDIC insured bank account in the state of Mississippi and to "avail herself of the benefits of investing through the CDARS plan to maximize protection of Blaine's assets and minimize her record keeping."

¶18. Natalie asserts that the trial court erred in requiring that the entirety of Blaine's settlement funds be placed into CDs. She argues that doing so violates both the reasonably prudent investor standard that governs fiduciaries[4] and the duty of a guardian to improve a ward's estate.[5] She claims that interest rates and other considerations related to investment in CDs effectively garner a negative return on the investment. She also argues that bond requirements for the investments should be waived because, if they are not, "[Section] 93-13-17 effectively prohibits a guardian from investing in any investment other than a fully insured bank account when a ward's assets are substantial – because either the guardian could not obtain a bond, or could not afford one." She asserts that such a requirement conflicts with the prudent investment statute.

¶19. The plain language of the guardianship statutes unequivocally requires a bond to be posted if the ward's estate is placed in non-insured investments:

> Every guardian, before he shall have authority to act, shall, unless security be dispensed with by will or writing or as hereinafter provided, enter into bond

---

[4] *See* Miss. Code Ann. § 91-13-3 (Rev. 2013).

[5] *See* Miss. Code Ann. § 93-13-38(2) (Rev. 2013).

payable to the state, in such penalty and with such sureties as the court may require; . . . .

A guardian need not enter into bond, however, as to such part of the assets of the ward's estate as may, pursuant to an order of the court in its discretion, be deposited in any one or more banking corporations, building and loan associations or savings and loan associations in this state so long as such deposits are fully insured, such deposits there to remain until the further order of the court, and a certified copy of the order for deposit having been furnished the depository or depositories and its receipt acknowledged.

Miss. Code Ann. § 93-13-17 (Rev. 2013). While we understand the desire to diversify Blaine's money and the difficulties surrounding obtaining such a large bond, the plain language of the statute simply tied the chancellor's hands. The testimony was that, for such a large amount, CDARS was the only practical manner in which the statute could be complied with – the only way that the funds could be deemed placed in Mississippi institutions and be fully insured such that the guardian's bond could be waived. Under Section 93-13-17, the chancellor had no option but to place the investment in a fully insured program such as CDARS, or to require that Natalie post a bond. Thus, the chancellor did not err in requiring that the entire settlement be put into CDARS.

¶20. The chancellor heard extensive testimony on all the investment options, asked questions regarding the proposed investment strategies, requested additional research on various investment strategies, and issued a lengthy and detailed judgment explaining her decision on the investment of the ward's settlement. In her order, the chancellor noted the guardian ad litem's "serious reservations" about the proposed investment of Blaine's funds, such as "the fluctuating stability of the economy, the recent failures of large investment companies . . . , the historically low interest rates [that] would affect the return on investment

11

rate of any structured annuity, and the requirement that the guardianship assets be bonded for moneys not held in FDIC insured accounts." The chancellor cited the court's "duty to wards under its protection to ensure the proper management of the ward's estate," and it was evident throughout the proceedings that her primary concern was Blaine's best interest. The record is clear that the chancellor very carefully considered all the options and made lengthy, detailed, and thorough findings of fact and conclusions of law. Even had the statute not tied the chancellor 's hands, we would not find an abuse of discretion under such a circumstance.

**Conclusion**

¶21. The chancery court did not abuse its discretion in denying the petition to transfer the guardianship from Mississippi to Louisiana and did not err in holding that all of Blaine's settlement funds should be placed into CDARS. Accordingly, we affirm the decision of the Amite County Chancery Court.

¶22. **AFFIRMED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, AND PIERCE, JJ., CONCUR. KING, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER, J.**

**KING, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶23. I agree with the majority that the trial court did not err in its ruling on investing the ward's funds. I disagree with the majority's holding that the chancellor properly refused to transfer the guardianship to Louisiana, because the chancellor failed to adhere to any recognized legal standard in making her decision to determine if the guardianship should be transferred to Louisiana, and thus, I believe that she abused her discretion, and therefore dissent.

12

¶24.    The majority claims that the chancellor based her decisions upon facts in addition to her belief that the marriage would fail.  The chancellor's full ruling on that issue is as follows:

> . . . I am going to rule on issue [sic], and I researched this issue heavily. Whether this guardianship is transferred to another jurisdiction is a matter that is entirely within the discretion of the Court by statute and otherwise. Guardianships are entirely statutory matters, therefore, will be governed by the statute. And since the statute gives this Court the discretion, I am going to rule on that.
>
> I am not transferring this guardianship at this point and this time of this child's life to another state.
>
> Now, if you want me to make the specific findings as to why the Court is not going to do that, it doesn't matter if the guardian ad litem asks that it be transferred.  It is not going to be transferred.
>
> This Court has approved a Memorandum of Understanding, and has through this wrangling and this child's assets remain under the control of some New York escrow account that is dissipating his assets, not growing his assets, and it is through this Court's authority that those funds are there and those funds are going to be dispersed from that account through this Court's authority.
>
> Now, the only tie that this child has to Louisiana is in an entirely mobile society is where his mother currently hangs her hat.  His mother who testified that she underwent unimaginable tragedy in the loss of her husband less than two years ago, that less than one year ago after having lived her entire life in Amite County, Mississippi, she met another gentlemen [sic] who had two unspeakable tragedies in his life.  His two best friends have been killed.  One of them with her husband, and one of them was the brother of another of the widows through which Ms. Deason lost Mr. Roshto, her then husband.
>
> I hope and pray that her relationship is a long and healthy one. *Statistically, having been brought together through this tragedy, having known Mr. Deason for such a short period of time, on the heels of her trauma, the Court would be hesitant to believe that this child will continue to reside in the state of Louisiana until his majority is removed.*
>
> Therefore, at this time in interest of promoting this child's stability, this Court is going to rule that this guardianship is and will remain a Mississippi guardianship, and that's going to be the order of the Court.  And I don't want to hear anything else about it.

13

(Emphasis added.) A reading of that ruling denying the transfer indicates that the denial was predicated solely upon the chancellor's belief that the mother's marriage was not stable and was likely to fail. It is significant that there is nothing in the record which calls into question the stability of the mother's marriage.

¶25. The court declined to transfer the guardianship to Louisiana, and based its decision on assumptions, not facts in the record, about Natalie's marriage, as evinced by its bench ruling denying the transfer, set out above in its entirety. The court noted that the sole basis of its decision was its belief that the marriage was "statistically" likely to fail. The court did not point to what "statistics" it was referring, nor did any of the parties place any such "statistics" in the record as evidence.[6] Essentially, the court declined to transfer the guardianship because it expressed doubt that Natalie's second marriage would last, and also appeared to assume that if it did not last, Natalie would not remain in Louisiana. This decision is not supported by or based upon any evidence placed before the court, as the only evidence before the court was that the marriage was a good one and that Natalie was stable and not prone to moving often. Indeed, this was the first major move Natalie had made in her entire life.

¶26. Mississippi Code Section 93-13-63 provides that "[i]f a guardian desire to remove the person and personal property of his ward out of this state, on petition and on his making

---

[6]The court's judgment on the issue did not provide any further explication. It merely stated that "[t]he Court took the matter up on that day, ruling from the bench that the request to transfer the matter to Louisiana was denied."

14

settlement of his guardianship accounts, the court which appointed him *may* make an order to that effect[.]" Miss. Code Ann. § 93-13-63 (Rev. 2013) (emphasis added).[7]

¶27.    Under an abuse-of-discretion standard, this Court must first ask whether the court below applied the correct legal standard. *Burkett v. Burkett*, 537 So. 2d 443, 446 (Miss. 1989); *Plaxico v. Michael*, 735 So. 2d 1036, 1038 (Miss. 1999). If, and only if, the lower court applied the correct legal standard, does this Court determine whether the lower court's decision was one of the several reasonable ones it could have made. *Burkett*, 537 So. 2d at 446; *Plaxico*, 735 So. 2d at 1038-39. "The trial court's decision will be affirmed unless there is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors." *Plaxico*, 735 So. 2d at 1039. This, of course, presupposes that the trial court weighed the relevant factors.

¶28.    In this case, the chancellor did not apply *any* legal standard, much less the "correct" one. While neither the Legislature nor this Court has outlined the relevant factors that a chancellor is to weigh in determining whether to transfer a guardianship, that does not give

_____

[7]The second part of the statute requires that the guardian post a bond conditioned on him qualifying as guardian in the state to which he intends to remove the ward or property, and on filing a complete inventory of the ward's property and effects with that court. Miss. Code Ann. § 93-13-63. While Natalie did not post such a bond, it is undisputed that the appropriate Louisiana court has already appointed her Blaine's tutrix (the Louisiana equivalent of a guardian) and that she has already filed a complete inventory of Blaine's assets with that court. Thus, the conditions of the statute in that regard have been met, obviating the need for a bond to be posted until she is appointed guardian in the other state and files an inventory there.

15

the chancellor license to apply *no* legal standard.[8]  In a factually similar case out of the Supreme Court of New York, the court stated:

> Discretion is not the judge's sense of moral right; neither is it his sense of what is just.  He is not clothed with a dispensing power or privilege to exercise his individual notions of abstract justice.  With him there is no scope for judicial caprice.  Principles of law are to be ascertained and followed.  Justice is administered in the courts on settled and fixed principles.  It does not vary "like the Chancellor's foot."  The rights of litigants do not rest in the discretion or grace of the judge.  In all cases that come under his consideration a judge must act with discretion and discrimination and give weight to every circumstance bearing on the question to be adjudicated.  He is not at liberty in determining personal or property rights to act at his own discretion unrestrained by the legal and equitable rules governing those rights.

***Matter of Bond***, 251 A.D. 651, 654 (N.Y. App. Div. 1937).

¶29.   Instead of formulating a legal standard for her decision, the court appeared to rely merely on "statistics" not found in the evidence, and unfounded predictions for the future.  Not only does the court's decision lack a founding in any legal standard, it is not based on any evidence in the record.  Furthermore, the trial court failed in its obligation to provide definitive, rather than gossamer, findings, so that this Court may adequately review its decision.  Thus, the combination of the court's failure to apply a legal standard, its reliance on speculative "statistics" not in evidence, and its failure to make specific findings give us no discernible standard that it applied to this case, constituting an abuse of discretion.

---

[8]It would be prudent for the Legislature to adopt standards regarding interstate guardianships, as it is apt to arise more often in our ever-increasingly mobile society. Absent legislative guidance, this Court should engage in our duty to interpret the statute as written and set forth guidance for the lower courts in exercising their discretion, as the lower courts cannot operate in a vacuum. *See, e.g.*, ***Parker v. State***, 119 So. 3d 987, 998, 998 n.16 (Miss. 2013).

16

¶30. Mississippi law does not provide any guidance to assist a court in determining whether a guardianship should be transferred. Natalie suggests using a standard such as that used in the Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act (Uniform Adult Guardianship Act). The Uniform Adult Guardianship Act provides that a court should enter a provisional order transferring a guardianship to another state if the court is satisfied that the other state will accept the guardianship and if:

1)   the ward is physically present in or is reasonably expected to move permanently to the other state;

2)   an objection to the transfer has not been made or, if an objection has been made, the objector has not established that the transfer is contrary to the interests of the ward; and

3)   plans for the care and services for the ward in the other state are reasonable and sufficient.

¶31. In a case in which Wisconsin was asked to accept the guardianship of an incompetent adult from Illinois, the Wisconsin Supreme Court generally opined on interstate guardianship transfers.[9] *In the matter of the Guardianship of Jane E.P.*, 700 N.W.2d 863 (Wis. 2005). Although the issue of transferring a guardianship out of state was not before it, the court took the opportunity to set forth standards for such, stating that the "standards will protect the integrity of the original court's determination of what is in the best interests of the ward." *Id.* at 865. The court noted that "[i]n many simple cases the conclusion is obvious: it is in the best interest of the ward to be near those who will love, care for, and comfort the ward."

---

[9]The Wisconsin legislature had not addressed the issue, and the court "strongly encouraged" it to do so. *Jane E.P.*, 700 N.W.2d at 870. "However, in the absence of legislative guidance, [the court] set[s] forth standards for Wisconsin courts to follow when confronting cases associated with the interstate transfer of guardianships." *Id.*

***Id.*** at 867. The court leaned heavily on the National Probate Court Standards (created by the Commission on National Probate Court Standards and Advisory Committee on Interstate Guardianships, a Project of the National College of Probate Judges and the National Center for State Courts). ***Id.*** at 872. Central to the National Probate Court Standards "is the concept of 'portability' – that is, that a guardianship established in one state should be able to be 'exported' or 'imported' from one state to another absent a showing of abuse of the guardianship." National Probate Court Standard 3.4, *available at* http://www.ncpj.org/images/stories/pdfs/National_Probate_Court_Standards.pdf (last visited March 25, 2014); *see also **Jane E.P.**,* 700 N.W.2d at 872. The intent "is to facilitate, and not to impede unnecessarily, the movement of a guardianship across state lines, and to speed decisions and case processing by the court while protecting, even furthering, the interests of the respondent and other interested persons." National Probate Court Standard 3.4; *see also **Jane E.P.**,* 700 N.W.2d at 872. "A guardianship is not intended to restrict freedom unreasonably or to limit the flexibility, choices and convenience available to the respondent. It should not unnecessarily limit choices and preferences." National Probate Court Standard 3.4; *see also **Jane E.P.**,* 700 N.W.2d at 872. However, the standards do note the potential problem of forum shopping for more advantageous guardianship or other related laws, such as Medicaid or termination of life support laws. National Probate Court Standard 3.4. The standards first encourage communication and cooperation between courts in different jurisdictions to assist in resolving guardianship issues. National Probate Court Standard 3.4.1; *see also **Jane E.P.**,* 700 N.W.2d at 872. The standards then adopt a very similar

18

standard for transferring guardianships as does the Uniform Adult Guardianship Act. National Probate Court Standard 3.4.3. It states:

> Probate courts may grant a petition to transfer a guardianship or conservatorship when:
>
> (1)    The respondent is physically present or is reasonably expected to move permanently to the other state or has a significant connection to the other state.
>
> (2)    An objection to the transfer has not been made or has been denied.
>
> (3)    Plans for the care of and services for the respondent and/or management of the respondent's property in the other state are reasonable and sufficient.
>
> (4)    The probate is satisfied that the guardianship/conservatorship will be accepted by the probate court in the other state.

National Probate Court Standard 3.4.3. The intent of this standard "is to *facilitate* the transfer of a guardianship and/or conservatorship to another state in cases in which the probate court is satisfied that the guardianship/conservatorship is valid and that the guardian/conservator has performed his or her duties properly in the interests of the respondent for the duration of his or her appointment." National Probate Court Standard 3.4.3 commentary (emphasis added). The standard assumes "that most guardians/conservators are acting in the interest of the respondent and that the notice and reporting requirements, and the opportunity to bring objections to the transfer to the attention of the court, are sufficient checks on the appropriateness of the transfer of the guardianship." *Id.*

¶32. The court in ***Matter of Bond*** did not set a standard for determining when transfer of a guardianship is appropriate, but it did rely heavily on the ward's out-of-state residence in deciding that the lower court abused its discretion by failing to transfer the guardianship.

19

*Matter of Bond*, 251 A.D. at 654. The court noted that the ward was a citizen and resident of the "sister state" and that her mother had been appointed as guardian in a court of the sister state, where both mother and child lived. *Id.* The court found that

> [t]here is eminent propriety in having the personal property of a ward in the same jurisdiction in which such ward has her legal residence. It will, as a general rule, be better cared for and administered at that place. We may confidently assume that the Superior Court of California will jealously guard this infant's estate against unwise or unnecessary dissipation. That court is much more convenient for the administration of the trust. . . .
>
> No plausible reason is suggested why the fund should not be transferred. We should not charge ourselves with the administration of the portion of the estate that is here where the proof conclusively shows the regularity of petitioner's appointment by a court of competent jurisdiction in the state where the ward resides and where the evidence convincingly shows the need of a change. There is not a scintilla of evidence to indicate that the removal of the fund would be inimical to the infant's interests. In fact, we may judicially notice that the estate would suffer financial loss by dual guardianship.

*Id.* at 654-55.

¶33. This Court should set forth factors that a chancellor may consider in making a determination of whether to transfer a guardianship to another state. I would propose the following standards be used:[10]

---

[10]Not all factors would be applicable to every case, but given that both minor children and adult wards are covered by this statute, a wide range of factors needs to be considered. I do not suggest that we mandate that chancery courts examine these factors in using their discretion. I merely suggest that *some* legal standard would be helpful to courts and would provide predictability to residents, and I suggest that these particular factors may help guide a court's decision. However, a chancery court would be free to use some, or none, of these standards, so long as it uses *some* legal standard.

1)   Whether the ward is a resident of, or is reasonably expected to move permanently to, the other state;[11]

2)   Whether any objection to the transfer exists, and if so, whether the objector establishes that the transfer will be contrary to the best interests of the ward;

3)   Whether the plans for care and services for the ward are reasonable and sufficient;[12]

4)   Whether the substantial rights of creditors and/or claimants in this state will be materially impaired by the transfer;

5)   Whether evidence exists that the requested transfer is for the primary purpose of forum-shopping;[13]

6)   Whether other facts in evidence suggest that the requested removal is for improper reasons or is otherwise contrary to the best interests of the ward.

This Court's review would benefit from a chancellor analyzing and weighing each factor applicable to the case before him or her and determining whether to transfer the guardianship. However, I emphasize that we should not create an all-inclusive or exclusive list, nor a

---

[11]I note that the ward's state of residence is often the most convenient, least expensive (for the estate) and best place for a guardianship to be located, and that courts should presume that, absent proof to the contrary, courts of a sister state will protect the ward's interests and estate just as zealously as would a court in this state.

[12]This factor would be more important in cases in which the court had a heavy hand in the ward's custody/person. In a case such as the one before us today, Natalie's parental rights were not extinguished or restricted simply because Blaine received a substantial amount of money.

[13]Principles of comity prevent us from making assumptions that the courts of our sister states, such as the court in La Salle Parish, Louisiana, are irrational or incompetent. Furthermore, substantive laws will always vary somewhat from state to state. Only upon evidence that a court is incompetent, or upon evidence that the *primary purpose* of the proposed transfer is forum-shopping, would this factor alone generally justify denying a proposed transfer.

checklist; certain findings regarding any factor or factors should not mandate a certain result. These considerations would simply provide guidance to chancellors as they exercise their discretion, as well as provide predictability to litigants.

¶34. I would reverse the trial court's decision to not transfer the guardianship because the trial court abused its discretion by failing to employ any legal standard, by failing to provide detailed findings, and by relying on unknown statistics not in evidence. I believe this Court should give chancery courts guidance as to some legal standard they should employ in determining whether to transfer a guardianship, and I would therefore remand the case for a determination by the trial court on the petition to transfer, using the applicable factors outlined, with the parties being given a chance to present evidence on each applicable factor. I therefore dissent from the portion of the majority opinion that affirms the trial court's denial of the motion to transfer.

¶35. Because I agree with the majority that the trial court did not err in requiring that the entire settlement be put into CDARS, I concur with the majority opinion to the extent it affirms the chancery court on the investment issue.

**CHANDLER, J., JOINS THIS OPINION.**